## RICHLAND–LEXINGTON AIRPORT DISTRICT, Plaintiff,

v.

## ATLAS PROPERTIES, INC., d/b/a Carolina Chemicals, James T. Wilds, Jr.,[1] United States of America, and Westinghouse Remediation Servs., Inc., Defendants.

Civ. A. No. 3:92–750–21.

United States District Court,
D. South Carolina,
Columbia Division.

March 3, 1994.

---

**3.** This document described Copestake's job as a "new position."

**1.** James Wilds filed a voluntary petition in bankruptcy; none of his rights, however, are being adjudicated in this opinion.

Clifford O. Koon, Jr., Columbia, SC, for plaintiff.

David Reece Williams, III, Raymond E. Clark, Asst. U.S. Atty., Columbia, SC, Michael T. McCaul, Ann V. Crowley, Naikang Tsao, Washington, DC, L. Gray Geddie, Jr., Phillip A. Kilgore, Greenville, SC, for defendants.

## *O–R–D–E–R*

TRAXLER, District Judge.

### I. *INTRODUCTION*

Before the court are the objections to the report and recommendation of the magistrate judge, *see* 28 U.S.C.A. § 636(b)(1) (West 1993), and a motion for summary judgment, *see* Fed.R.Civ.P. 56(c). Richland–Lexington Airport District ("RLAD") brought various claims[2] pursuant to the Federal Torts Claim Act ("FTCA"), 28 U.S.C.A. §§ 2671–2680 (West 1965 & Supp.1993), against the United States. The United States, through the Environmental Protection Agency ("EPA"), moved to dismiss these FTCA claims pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, asserting that this court lacked subject matter jurisdiction to entertain these claims. RLAD also brought a claim against the EPA pursuant to § 9607(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C.A. §§ 9601–9657 (West 1983 & Supp.1993). Likewise, Westinghouse Remediation Services, Incorporated ("WRS"), and Atlas Properties, Incorporated, doing business as Carolina Chemicals ("Carolina"), brought crossclaims for indemnity against the EPA pursuant to § 9607(e) of CERCLA. The EPA moved to dismiss RLAD's CERCLA claim and WRS and Carolina's CERCLA crossclaims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, contending that RLAD, WRS, and Carolina failed to state claims upon which relief could be granted. Additionally, the EPA moved to dismiss WRS's contract claim against it pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, again contending that this court lacked subject matter jurisdiction to entertain this claim. The magistrate judge recommended denial of the EPA's motion to dismiss the FTCA claims asserted by RLAD;

however, the magistrate judge recommended that RLAD's CERCLA claim asserted against the EPA be dismissed for failure to state a claim. The magistrate judge further recommended that the indemnity crossclaims by WRS and Carolina be dismissed for failure to state a claim and that the contract claim by WRS be dismissed for lack of subject matter jurisdiction. The EPA has objected to the report and recommendation with respect to the FTCA claims, again contending that this court lacks subject matter jurisdiction with respect to these claims. WRS has objected to the magistrate judge's recommendation that its indemnity crossclaim and breach of contract crossclaim be dismissed. Carolina has not objected to the report and recommendation. Also before this court is the motion by WRS for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure against RLAD's claims.[3] Concluding that this court lacks jurisdiction to entertain RLAD's FTCA claims, the EPA's motion to dismiss the claims brought pursuant to the FTCA is granted; also, the EPA's motion to dismiss the CERCLA claim is granted. Likewise, the EPA's motion to dismiss the indemnity crossclaims of WRS and Carolina is granted, as is the EPA's motion to dismiss the breach of contract crossclaim by WRS. Finally, the motion by WRS for summary judgment is granted.

### II. *THE FACTS*

The material facts are not disputed. Carolina owned and operated a pesticide manufacturing and packaging plant on its property ("site"), which is adjacent to property owned by RLAD. As a result of contamination of Carolina's property, the EPA instituted

---

2. RLAD asserted common law claims of trespass, private nuisance, negligence, strict liability, and a state statutory claim for violation of the South Carolina Pollution Control Act, S.C.Code Ann. §§ 48–1–10 to 48–1–350 (Law. Co-op. 1976 & Supp.1993), against the EPA.

3. While this motion was originally before the magistrate judge, he did not issue any recommendation with respect to disposition of this motion. Thus, this motion is addressed in the first instance in this court. RLAD asserted the same claims against WRS that it asserted against the EPA, *see supra* n. 2.

clean-up activities and employed WRS to remove the hazardous wastes from the site. Accordingly, WRS excavated, removed, and stockpiled the contaminated soil from the site. RLAD avers that this stockpile was partially deposited on its property; and as a result, its property became contaminated. The parties do not dispute that a portion of the stockpile was on RLAD's property, although the EPA argues that RLAD's property was already contaminated, the stockpile notwithstanding.

By letter dated February 16, 1990, RLAD notified the EPA that the stockpile was partially situated on RLAD's property, describing the alleged misplacement as "inadvertent and unintentional." In this letter, RLAD further stated that it supported the EPA's clean-up efforts. Finally, RLAD proposed a meeting with the EPA to address the parties' contentions. This letter contained no statement that RLAD was seeking a claim against the United States, nor did it reference any amount of damages for which RLAD sought compensation.

On March 15, 1990, the EPA responded to this letter, answering the concerns RLAD expressed and agreeing that a meeting was appropriate. The EPA reiterated its contentions that part of RLAD's property was contaminated prior to the stockpile's placement, that this contamination was not caused by the stockpile, that this contamination posed a threat to the environment, and that RLAD may be a potentially responsible party with respect to contamination.

By letter dated March 23, 1990, RLAD characterized the EPA's letter of March 15, 1990 as "designed to posture or intimidate." RLAD repeated its desire to convene a meeting, disclaimed any responsibility for contamination, and attributed any contamination to misplacement of the stockpile. This letter further stated that RLAD was "prepared to discuss [the EPA's] dumping of hazardous waste on [RLAD's] property and its plans to remove it and compensate the [RLAD] for any damages [that the EPA has] caused." No amount of compensation was demanded, however.

RLAD and the EPA eventually convened a meeting on March 27, 1990. This meeting was apparently little more than a recitation of the parties' original contentions: RLAD disclaimed any liability for contamination, while the EPA maintained that portions of RLAD's property apart from that on which the stockpile was placed was already contaminated and that this contamination was not the result of the stockpile. The EPA summarized the results of the meeting by a letter to RLAD dated April 18, 1990.

By two more letters dated April 24, 1990 and May 15, 1990, RLAD requested information that the EPA had concerning clean-up activities. These letters further stated that the EPA could have access to RLAD's property to effectuate any clean-up. As with the previous letters, RLAD never stated in these letters that it was pursuing a claim against the United States because of the misplaced stockpile, nor did these letters state that RLAD was entitled to a definitive amount of damages.

On May 17, 1990, RLAD wrote another letter to the EPA. This letter recited what RLAD considered to be a reflection of the parties' understanding with respect to clean-up of the site. RLAD also reiterated its assertion that it was not a potentially responsible party with respect to any contamination. This letter did not state that RLAD was bringing a claim or seeking a specific amount of damages against the United States.

Eventually, RLAD instituted these proceedings against the Defendants pursuant to the FTCA and CERCLA. The EPA responded that this court lacked subject matter jurisdiction to hear the FTCA claims because RLAD had not complied with the statutory requirements of § 2675(a) of the FTCA. The EPA contended that the correspondence between RLAD and the EPA did not constitute a claim as prescribed by § 2675(a). Specifically, the EPA asserted that RLAD failed to file notice in writing that RLAD was suing the United States and that RLAD failed to provide a sum certain with respect to its alleged damages. With respect to the CERCLA claim, the EPA contended that RLAD failed to state a claim upon which relief could be granted because the United

States had not waived its sovereign immunity with respect to this claim. Concluding that the correspondence between RLAD and the EPA fulfilled the requirements of § 2675(a), the magistrate judge recommended that RLAD's claims brought under the FTCA proceed. The magistrate judge recommended, however, that RLAD's CERCLA claim be dismissed; likewise, the magistrate judge concluded that WRS and Carolina's claims against the EPA should be dismissed. From the various recommendations of the magistrate judge, the parties have interposed objections. This court will consider the objections of the EPA and WRS to the magistrate judge's report and recommendation, as well as the motion for summary judgment filed by WRS against RLAD.

## III. *THE PROCEDURAL STANDARD*

### A. *The Dismissal Standard*

■ Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the EPA has moved to dismiss RLAD's claims brought pursuant to the FTCA and WRS's breach of contract claim for lack of subject matter jurisdiction. Additionally, the EPA moved to dismiss RLAD, WRS, and Carolina's CERCLA claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil procedure for failure to state a claim upon which relief could be granted. Motions raised via Rules 12(b)(1) and 12(b)(6) are governed by different legal standards. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408 (3d Cir.), *cert. denied*, 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). The party bearing the burden of proof differs with respect to the two motions: if "subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff must bear the burden of persuasion. On the other hand, under Rule 12(b)(6) the defendant has the burden of showing no claim has been stated." *Id.* A Rule 12(b)(1) motion does not necessitate a ruling on the merits, whereas a Rule 12(b)(6) motion does. *See Mortensen v. First Federal Savs. & Loan, Ass'n*, 549 F.2d 884, 891 (3d Cir.1977) (questioned on other grounds, *Kulick v. Pocono Downs Racing Ass'n*, 816 F.2d 895, 898 n. 7 (3d Cir.1987)). In ruling upon motions made pursuant to Rule 12(b)(6), the court

may look beyond the pleadings to determine whether the suit should proceed; and if this is done, the motion is converted into one for summary judgment pursuant to Rule 56(c), *see Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1473 (4th Cir. 1991), but this conversion principle does not apply to Rule 12(b)(1) motions, *see id.* While the court may consider exhibits outside the pleadings with respect to both Rule 12(b)(1) and Rule 12(b)(6) motions, *see Mortensen*, 549 F.2d at 891, only the Rule 12(b)(6) motion is converted into one for summary judgment. The court therefore discusses the Rule 12(b)(1) and Rule 12(b)(6) motions separately.

### 1. *Rule 12(b)(1)*

■ A motion to dismiss pursuant to Rule 12(b)(1) may attack the complaint on its face or attack the existence of subject matter jurisdiction. *See id.* If the complaint is facially attacked, the court must accept the allegations as true, but no such presumption applies to a factual attack. *See id.* Rather, the court may freely consider the evidence to satisfy itself that jurisdiction is proper, *see id.*, because "a court may not ... extend its jurisdiction where none exists," *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 818, 108 S.Ct. 2166, 2179, 100 L.Ed.2d 811 (1988). The present attack is a factual attack because the parties have submitted exhibits for the court to consider in determining whether there is subject matter jurisdiction in the district court.

### 2. *Rule 12(b)(6)*

As stated, if the court examines exhibits outside the pleadings, a Rule 12(b)(6) motion is converted in a motion for summary judgment pursuant to Rule 56. Because exhibits outside the pleadings are considered here, all Rule 12(b)(6) motions are converted into motions for summary judgment and are thus measured against the summary judgment standard.

### B. *The Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, the Rule requires that the court enter judgment against a party who, "after adequate time for ... discovery fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party seeking summary judgment shoulders the initial burden of demonstrating that there is no genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2552. Accordingly, to prevail on a summary judgment motion, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. A fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue of material fact is "genuine" if the evidence so offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257, 106 S.Ct. at 2514. In determining whether a genuine issue has been raised, the court must construe all inference against the movant and in favor of the non-movant. *Id.* at 257–58, 106 S.Ct. at 2515. On a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Heyman v. Commerce & Indus. Ins.*, 524 F.2d 1317, 1319–20 (2d Cir.1975). The non-movant, however, "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). Rather, if the evidence "is so one-sided that one party must prevail as a matter of law," the court must enter summary judgment. *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512. Hence, the non-movant, to survive the motion, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553.

Summary judgment serves the useful purpose of disposing of meretricious, pretended claims before the court and parties become "entrenched in a frivolous and costly trial." *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 58 (2d Cir.1987). The courts, therefore, should not be reluctant to grant summary judgment in appropriate cases; indeed, summary judgment is mandated where appropriate. *See, e.g., Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *United States v. Porter*, 581 F.2d 698, 703 (8th Cir.1978); *Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103, 104 (S.D.N.Y.1989); *Burleson v. Illinois Farmers Ins. Co.*, 725 F.Supp. 1489, 1490 (S.D.Ind.1989). In a recent trilogy of decisions—*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)—the Supreme Court has consistently reaffirmed its endorsement of pretrial resolution and summary disposition. These decisions reflect the mandatory nature of Rule 56. In *Celotex Corp.*, the Court stated:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual bases.

*Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555 (citations and internal quotation marks omitted). The law therefore compels that summary judgment be entered if a complainant's action cannot be maintained. Against

this procedural standard, the court examines the merits.

## IV. THE MERITS

The court will first examine the claims by RLAD against the EPA. Next, the court will address the crossclaims by WRS and Carolina. Finally, the court will address the motion for summary judgment by WRS.

### A. RLAD's Claims against the EPA

 The dispositive issue for this court with respect to RLAD's FTCA claims against the EPA is whether the correspondence between these two parties constituted sufficient notice of the claim under § 2675(a) of the FTCA. Subsection 2675(a) provides:

An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail. The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section. The provisions of this subsection shall not apply to such claims as may be asserted under the Federal Rules of Civil Procedure by third party complaint, cross-claim, or counterclaim.

28 U.S.C.A. § 2675(a) (West Supp.1993). Thus, § 2675(a) requires that a claimant give notice of his claim to the appropriate federal agency. A claimant satisfies the notice requirement of § 2675(a) "if he provides in writing (1) sufficient information for the agency to investigate the claims, and (2) the amount of damages sought." *Farmers State Savs. Bank v. Farmers Home Admin.*, 866 F.2d 276, 277 (8th Cir.1989) (citation omitted). The courts uniformly hold that notice pursuant to § 2675(a) absolutely requires sufficiently detailed information to apprise the federal agency that a claim is being asserted against the United States and the statement a sum certain. *See, e.g., Santiago–Ramirez v. Secretary of Dep't of Defense,* 984 F.2d 16, 19 (1st Cir.1993) (Notice for purposes of § 2675(a) requires "(1) sufficient information for the agency to investigate the claims, and (2) the amount of damages sought."); *Cizek v. United States,* 953 F.2d 1232, 1233 (10th Cir.1992) (Notice under § 2675(a) requires "(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum certain damages claim.") (internal quotation marks omitted); *Montoya v. United States,* 841 F.2d 102, 105 (5th Cir.1988) (Under § 2675(a), "valid notice requires a writing that informs the agency of the facts of the incident and the amount of the claim."); *Keene Corp. v. United States,* 700 F.2d 836, 842 (2d Cir.) (The notice of claim requirement pursuant to § 2675(a) demands "sufficient information both to permit an investigation and to estimate the claim's worth."), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983). The courts also uniformly hold that the requirement that notice of a claim be filed is jurisdictional and cannot be waived. *See, e.g., Cook v. United States,* 978 F.2d 164, 166 (5th Cir.1992); *Cizek,* 953 F.2d at 1233; *Livera v. First Nat'l State Bank of New Jersey,* 879 F.2d 1186, 1194 (3d Cir.), *cert. denied,* 493 U.S. 937, 110 S.Ct. 332, 107 L.Ed.2d 322 (1989); *Henderson v. United States,* 785 F.2d 121, 123 (4th Cir.1986); *Keene Corp.,* 700 F.2d at 841. Thus, "[n]oncompliance with section 2675 deprives a claimant of federal court jurisdiction over his or her claim." *Adams v. United States,* 615 F.2d 284, 290 (5th Cir. 1980), *clarified by* 622 F.2d 197 (5th Cir. 1980). The sufficiency of the notice requirement under § 2675(a) "is more than a question of technical niceties." *Keene Corp.,* 700 F.2d at 842. Providing sufficient notice fulfills the Congressional policies that prompted the statute's enactment: (1) "to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States;" and (2) "[to] provide[ ] for more fair and equitable treatment of private individuals and claim-

ants when they deal with the Government or are involved in litigation with their Government." S.Rep. No. 1327, 89th Cong., 2d Sess. 5–6, *reprinted in* 1966 U.S.C.C.A.N. 2515–16. Because § 2675(a) constitutes a waiver of the United States's sovereign immunity, its provisions must be strictly construed. *Keene Corp.*, 700 F.2d at 841; *Three–M Enters., Inc. v. United States*, 548 F.2d 293, 295 (10th Cir.1977). As the Supreme Court has noted with respect to construing § 2675(a), " 'strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law,' " particularly if the litigant is represented by counsel. *McNeil v. United States*, —— U.S. ——, ——, 113 S.Ct. 1980, 1984, 124 L.Ed.2d 21, 29 (1993) (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826, 100 S.Ct. 2486, ——, 65 L.Ed.2d 532 (1980)). No particular fashion of giving notice is required under § 2675(a), *Cook*, 978 F.2d at 166, and letters may constitute sufficient notice for purposes of § 2675(a), provided they contain the mandatory notice requirements of sufficient information to apprise the United States that a claim is being asserted against it and a specified amount of damages, *see, e.g., Santiago–Ramirez*, 984 F.2d at 19–20; *Farmers State Savs. Bank*, 866 F.2d at 277; *Molinar v. United States*, 515 F.2d 246, 249 (5th Cir.1975).[4] The court will now examine various cases applying these propositions.

In *McNeil*, pro se litigant McNeil attempted to bring a claim for $20 million against the United States pursuant to § 2675(a). *McNeil*, —— U.S. at ——, 113 S.Ct. at 1981, 124 L.Ed.2d at 25. The district court granted the Government's motion to dismiss, reasoning that it lacked subject matter jurisdiction to entertain the action because McNeil failed to exhaust the administrative remedies prescribed by § 2675(a). *Id.* at ——, 113 S.Ct. at 1982, 124 L.Ed.2d at 26.

The Supreme Court affirmed, observing that the language of § 2675(a) was "unambiguous," *id.* at ——, 113 S.Ct. at 1983, 124 L.Ed.2d at 27, presented no " 'trap for the

unwary,' " *id.* at ——, 113 S.Ct. at 1984, 124 L.Ed.2d at 28, and thus the Court was "not free to rewrite the statutory text," *id.* at ——, 113 S.Ct. at 1983, 124 L.Ed.2d at 27. The Court concluded that because McNeil had not properly complied with the administrative procedures of § 2675(a), the district court lacked jurisdiction to entertain his claim: "[t]he FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies. Because petitioner failed to heed that clear statutory command, the District Court properly dismissed his suit." *Id.* at ——, 113 S.Ct. at 1984, 124 L.Ed.2d at 29. Thus, claims brought pursuant to § 2675(a) will be dismissed for failure to comply with the exhaustion requirement.

Regarding notice via letters, the Fourth Circuit Court of Appeals in *College v. United States*, 572 F.2d 453 (4th Cir.1978), recognized that while letters may constitute sufficient notice, they must comply with the requirements of § 2675(a). Claimant College sustained personal injury while on a military installation and sued the United States under the FTCA. *Id.* at 454. College apprised the United States of the suit by letter from counsel, and this letter included information "that an accident had occurred; that there was permanent injury; that surgery was done at the medical center on certain dates ... and that ... the accident [was] due to the negligence of the [United States]." *Id.* The Fourth Circuit held that the letter was fatally deficient because it failed to provide a sum certain and thus sustained dismissal of the suit. *Id.*

Similarly in *Montoya*, the Fifth Circuit Court of Appeals held that the claimant's letter did not satisfy the notice requirements of § 2675(a). Claimant Montoya and passengers riding in her automobile sustained various injuries when the automobile in which they were riding was struck by a government employee. *Montoya*, 841 F.2d at 103. Montoya submitted an SF95, which provided a specific dollar amount with respect to injury

---

4. While no particular method of notice is required, the Standard Form 95 ("SF95") is the preferred method for notifying the agency that a claim is being presented. *See Cook*, 978 F.2d at

166. *See also Montoya*, 841 F.2d at 104 (noting that "[t]he government would prefer that the claims be made on the carefully crafted SF95 application").

to person and property, as well as a letter from her attorney detailing her injuries. *Id.* This letter from Montoya's attorney stated that Montoya suffered various physical injuries and that "[s]he suffered property damages in excess of $1,500.00," but there were no references to the amount of damages with respect to personal injury. *Id.* This letter further detailed the physical injuries sustained by the passengers, but again was tacit with respect to the amount of damages claimed. *Id.* Montoya sued, but the district court dismissed her complaint for want of jurisdiction because she did not pursue her administrative relief by properly filing a claim. *Id.* at 104.

.The Fifth Circuit affirmed, likewise concluding that Montoya had failed to give sufficient notice. *Id.* at 105. Although the court noted that some of its prior precedents were more indulgent with respect to satisfying the notice requirements of § 2675(a),[5] the court had no difficulty in holding that "counsel's letter ... did not give valid notice." *Id.* The letter was fatally defective because it failed to state a sum certain with respect to all claims: "the letter speaks of property damage 'in excess of $1,500.00,' but [Montoya] fails to quantify her personal injury claim. Counsel's letter [does not] suffice[ ] as a claim under 28 U.S.C. § 2675(a)...." *Id.* The letter did not constitute proper notice of a claim because it did not provide a sum certain for the alleged injuries; accordingly, the action was properly dismissed for want of jurisdiction.

Similarly, in *Driggers v. United States,* 309 F.Supp. 1377 (D.S.C.1970), the court held that a series of letters from the claimant did not operate to serve as effective notice for purposes of § 2675(a). Claimant Driggers sustained injuries in an automobile accident and sued the United States under the FTCA. *Id.* at 1378. The United States moved to dismiss the action pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, contending that the district court lacked jurisdiction because Driggers did not file his claim with the federal agency, as required by § 2675(a). *Id.* Driggers, however, asserted that he should be relieved of the burden of filing a notice of claim with the appropriate agency because of his correspondence with the United States via two letters from his counsel and a claim by the United States for injury to government property that was forwarded to him. *Id.* The first letter was from Driggers's counsel and requested that the driver of the automobile that struck Driggers contact the attorney with information regarding liability insurance. *Id.* The second letter was also from Driggers's counsel and was sent to the agency that employed the allegedly negligent driver and requested that the parties discuss settlement. *Id.* Driggers contended that these letters, coupled with the government claim against him, constituted sufficient notice under § 2675(a).

The district court, however, concluded that this correspondence did not constitute notice because it failed to comply with the mandates of § 2675(a). *Id.* at 1380. With respect to the letters from counsel for Driggers, the court observed that they simply failed to constitute written notice of a claim and that they failed to provide a sum certain with respect to the injuries sustained by Driggers as contemplated by § 2675(a). *Id.* at 1379. With respect to the claim asserted against Driggers by the United States, the court stated that this claim did not operate as a denial of Driggers's claim by the appropriate agency as an administrative exhaustion requirement prior to suit in the district court. *Id.* Accordingly, the court held that notice was not perfected and thus dismissed the action for want of jurisdiction.

---

**5.** Earlier Fifth Circuit cases took a rather lenient view as to what constituted proper notice for purposes of § 2675(a). *See, e.g., Williams v. United States,* 693 F.2d 555, 558 (5th Cir.1982); *Crow v. United States,* 631 F.2d 28, 30 (5th Cir. 1980) (per curiam); *Molinar v. United States,* 515 F.2d 246, 249 (5th Cir.1975). More recent decisions from that court, however, have taken a more stringent view with regard to notice and have distinguished earlier cases. *See, e.g., Cook,* 978 F.2d at 166; *Montoya,* 841 F.2d at 104–05; *Wardsworth v. United States,* 721 F.2d 503, 505–06 (5th Cir.1983), *cert. denied,* 469 U.S. 818, 105 S.Ct. 87, 83 L.Ed.2d 34 (1984). Fifth Circuit precedent appears to be moving toward a stricter notice requirement, as is in keeping with the majority of circuits. *See, e.g., Cizek,* 953 F.2d at 1233–34; *Keene,* 700 F.2d at 841–42; *Bialowas v. United States,* 443 F.2d 1047, 1049–50 (3d Cir.1971).

412

Similarly, in *Keene Corp.*, the claimants filed a notice of claim pursuant to the FTCA with various agencies in an attempt to seek relief for injuries allegedly caused by asbestos. *Keene Corp.*, 700 F.2d at 840. With respect to the amount of damages, the notice stated that the claims were worth $1,088,135, but that this sum did "not include other Damages of which [they were] not presently aware." *Id.* at 841. Subsequently, the claimants also stated that they were entitled to "$1,088,135 and ... an additional amount yet to be ascertained." *Id.* The district court dismissed the claims for lack of subject matter jurisdiction, ruling, with respect to the FTCA claims, that the claimants had failed to provide sufficient notice. *Id.* at 838. The Second Circuit affirmed, concluding that notice was fatally insufficient for two reasons: lack of a sum certain and the generality of the information provided by the claimants. *Id.* at 843.

With respect to the sum certain, the court observed "that the statement of damages in any Notice of Claim must contain a sum certain," *id.* at 841–42, and that this requirement was not satisfied here because a claim for an amount of damages reckoned at " 'an additional amount yet to be determined' " was "so indefinite as to fail to satisfy the statutory purposes," *id.* at 842. With respect to the specified amount of $1,088,135, the court likewise concluded that this amount "failed to satisfy the statutory purposes" because this was an aggregate amount, yet applicable to several claims. *Id.* The court noted that where claims are aggregated, "the claimant must present the government with a definite damage amount for each claim." *Id.* The court stated that the certainty of the amount of damages was absolutely necessary so that the Government could properly evaluate the claim, and not subsequently face the consequences of inordinate damages in the future. *Id.*

With respect to the lack of information, the court concluded that the purported notice was deficient because of its "generality of ... statement." The court stated that the claimants failed to provide sufficient information with respect to the merits of their claims. *Id.* The court observed that notice must do

more than cause "the government to sift through the record." *Id.* Rather, notice must be sufficiently detailed so that the United States can "evaluate its exposure as far as liability is concerned." *Id.* Therefore, in addition to requiring a sum certain, a claimant must also provide a sufficient factual predicate so that his claim can be investigated.

Some courts, however, appear to be more lenient with respect to the notice requirement of § 2675(a). For example, in *Blue v. United States*, 567 F.Supp. 394 (D.Conn. 1983), on which the magistrate judge and RLAD heavily relied, the district court concluded that claimant Blue satisfied the requirements of § 2675(a), *id.* at 399, even though he never provided the federal agency with a sum certain in damages, *id.* at 398. Blue, however, did provide a sworn statement to the government caseworker evaluating his claim and specifically articulated his claims and grievances; additionally, the "medical reports and itemized bills concerning [Blue's] injuries and treatment originated with and remain in the possession of the government." *Id.* at 397. Materially, the Government's liability for Blue's claims had already been judicially established. *Id.* at 395. The Government therefore had sufficient information to investigate the claim—indeed, it had already been adjudged liable—and to calculate Blue's sum certain. Conspicuously, *Blue* expressly stated that it was confined to its facts. *Id.* at 398.

Other courts have likewise held that claimants met the requirements of § 2675(a), even though the notice was less than ideal. *See, e.g., Santiago–Ramirez*, 984 F.2d at 19–20; *Farmers State Savs. Bank*, 866 F.2d at 277; *Crow*, 631 F.2d at 30; *Molinar*, 515 F.2d at 249. In all of these cases, however, the claimant provided more than cursory information so that the claim could be investigated and likewise stated a sum certain or provided information so that a sum certain could be accurately calculated. For example, in *Santiago–Ramirez*, the First Circuit Court of Appeals concluded that the claimant's letter to the federal agency satisfied § 2675(a) because "it state[d] the identity of [claimant], the date of the incident, the location of the

incident, the government agent involved, and the type of injury alleged. It also· state[d] the amount of the damages the [claimant] is requesting." *Santiago–Ramirez*, 984 F.2d at 20. Additionally, the letter indicated the legal theories on which the claimant's claims were based. Likewise, in *Farmers State Savs. Bank*, the claimant's letter was deemed satisfactory for purposes of § 2675(a) because it "outlined in detail the events that led to its exposure" to liability and precisely stated that its damages were $80,000.00. *Farmers State Savs. Bank*, 866 F.2d at 276. In *Crow* and *Molinar*, the Fifth Circuit Court of Appeals concluded that the claimants had satisfied § 2675(a) because they had included itemized "bills and [an] estimate" in *Molinar*, *Molinar*, 515 F.2d at 247, and "an invoice and inventory of items" in *Crow*, *Crow*, 631 F.2d at 30.[6] Additionally, in both *Molinar* and *Crow*, the claimants had been scrupulous in pursuing their claims. The content of these letters, coupled with the explanation of damages, sufficiently apprised the agency of a claim and provided a sum certain. In all of these cases, the United States was fully aware that it was being sued and was provided a sum certain.

Applying the above principles to the instant action leads to the inexorable conclusion that the correspondence between RLAD and the EPA fails to satisfy § 2675(a), and thus any claims by RLAD based on the FTCA must be dismissed for want of jurisdiction. Whether the correspondence constitutes sufficient notice that the United States was being sued so that it could investigate the claim is a close question,[7] but one the court need not resolve because the correspondence fatally fails the second prong of § 2675(a) because RLAD never demanded a sum certain. Construing the letters to constitute sufficient information to commence an investigation, the claim ultimately fails because it does not provide a sum certain.

The record reveals, and the letters reflect, that there is no evidence of an amount of damages claimed by RLAD. At no time did RLAD ever place a dollar amount on its damages, and this requirement is absolutely necessary to establish jurisdiction in the district court. The court in *College v. United States*, 411 F.Supp. 738 (D.Md.1976), *aff'd*, 572 F.2d 453 (4th Cir.1978), articulated several reasons for the requirement of a sum certain. For example, ascertaining a sum certain apprises the agency of the propriety and efficacy of settlement. *Id.* at 741. Also, definitively identifying the claim permits investigation into any insurance coverage that the agency may have, as well as permits the agency to make a final disposition with respect to the claim. *Id.* Additionally, if claimants were not compelled to provide a sum certain, they may "withhold vital information and hinder settlement of a claim in hopes of obtaining a better disposition in court." *Id.* Finally, this requirement comports other sections of the FTCA. *Id.* The agency must be apprised of the facts underlying the putative claim and the amount of damages so that the Government can "avoid unnecessary litigation . . . and determine the potentiality of settling the claim." *Le Grand v. Lincoln*, 818 F.Supp. 112, 115 (E.D.Pa. 1993). Under circumstances far more compelling than those presented here, *e.g.*, *Montoya*, *Keene Corp.*, the courts have concluded that failure to provide the necessary information results in dismissal. Unlike *Molinar* and *Crow*, in this action there are not even any bills or receipts that "make[ ] it possible for the government—or a court—to evaluate [the claimant's] action against the government." *Keene Corp.*, 700 F.2d at 842. That a claimant provide a definite amount of damages is a requirement of the statute, and this court simply cannot relieve RLAD from its statutory burdens. Therefore, RLAD's

**6.** *See supra* n. 5.

**7.** A claim "require[s] more than mere notice of a potential lawsuit," *Molinar*, 515 F.2d at 249, and while letters complaining of injury are "notice of some sort, [they] . . . cannot be classified as an administrative claim," *Landis v. United States*, 335 F.Supp. 1321, 1322 (N.D.Ohio 1972). To satisfy § 2675(a), therefore, more than a general-

ized expression of aggrievement is required. Rather, a claimant must evince clear action to transform his aggrievement into a claim for purposes of this statute. The medium through which this transformation is accomplished must be unequivocal because such express action must make clear that the claimant has definitively formulated his grievance into a claim.

claims brought pursuant to the FTCA are dismissed for want of jurisdiction.

### B. *RLAD's CERCLA claim against the EPA*

 RLAD asserted a claim against the EPA under CERCLA, alleging that the EPA was a present or prior owner or operator, generator, transporter, or controlling entity that caused a release or threatened release of hazardous substances. *See* 42 U.S.C.A. § 9607(a) (West Supp.1993).[8] The EPA contends that this claim must be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure because there has been no specific waiver of sovereign immunity under CERCLA for this claim. RLAD concedes that the EPA's motion to dismiss for failure to state a claim upon which relief can be granted is proper with respect to the CERCLA claim, and that concession is wise. CERCLA contemplates that a governmental agency may be held liable under its provisions if the agency did indeed act as an owner, operator, generator, or transporter of hazardous substances. *See* 42 U.S.C.A. § 9620(a) (West Supp.1993). Subsection 9620(a), however, has not generally been read as a waiver of sovereign immunity. *See United States v. Western Processing Co.,* 761 F.Supp. 725, 728 (W.D.Wash.1991); *B.R. Mackay & Sons v. United States,* 633 F.Supp. 1290, 1296 n. 9 (D. Utah 1986), and here the United States never waived its sovereign immunity. The case law further reveals that liability does not attach where, as here, the EPA is engaged in clean-up activity in a regulatory capacity. *See United States v. Skipper,* 781 F.Supp. 1106, 1111 (E.D.N.C. 1991); *Western Processing,* 761 F.Supp. at 729–31. Therefore, the EPA is entitled to summary judgment with respect to RLAD's CERCLA claim.

### C. *CERCLA Crossclaims by WRS and Carolina against the EPA*

 WRS and Carolina[9] filed indemnification crossclaims against the EPA with respect to any claims that RLAD asserted against them pursuant to CERCLA. *See* 42 U.S.C.A. § 9607(e) (West 1983). This court recently addressed the concept of indemnity, *see Myrtle Beach Pipeline Corp. v. Emerson Electric Co.,* 843 F.Supp. 1027, 1062–65 (D.S.C.1993), and will not repeat that discussion here. Subsection 9607(e), however, applies provided that there is primary liability under another section, such as §§ 9606, 9607. For the same reason that RLAD cannot assert its CERCLA claim against the EPA, neither can WRS assert its indemnification crossclaim. Here, there has been no waiver of sovereign immunity by the EPA, so WRS cannot assert a crossclaim against it. Accordingly, the EPA is entitled to summary judgment with respect to the indemnification crossclaims of WRS and Carolina brought pursuant to CERCLA.

### D. *WRS's Contract Crossclaim*

WRS asserted an indemnification crossclaim against the EPA for breach of contract. The EPA moved to dismiss this claim pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, asserting that this court lacks subject matter jurisdiction to adjudicate this claim for two reasons. First, the EPA argues that an indemnification crossclaim based on breach of contract falls within the ambit of the Contract Disputes Act ("CDA"), *see* 41 U.S.C.A. §§ 601–613 (West 1987 & Supp.1993), and that WRS must first present its crossclaim to a contracting officer, *see id.* at § 605, and appeal the decision of the contracting officer to the board of contract appeals, *see id.* § 606, or as an alternative to appealing the decision of the contracting officer, file a claim in the United States Court of Federal Claims, *see id.* at § 609. The EPA argues that this administrative scheme must be exhausted as a prerequisite to suit. Second, the EPA asserts that regardless of whether WRS properly

---

8. This court has previously addressed the elements that a plaintiff must allege and establish in order to prevail on a claim brought pursuant to § 9607(a). *See Rhodes v. County of Darlington,* 833 F.Supp. 1163, 1177–96 (D.S.C.1992).

9. Carolina filed no objections to the report and recommendation of the magistrate judge. Any objections it may have had are waived. *See United States v. Schronce,* 727 F.2d 91, 94 (4th Cir.), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).

exhausted its administrative remedies under the CDA, this court lacks subject matter jurisdiction because 28 U.S.C.A. § 1346(a)(2) (West 1993)[10] confers exclusive jurisdiction on the Court of Federal Claims for contract claims against the United States for damages in excess of $10,000.00. Conversely, WRS contends that jurisdiction is proper in this court under either the supplemental jurisdiction provision of 28 U.S.C.A. § 1367(a) (West 1993) or under the pendency of claims provision of 28 U.S.C.A. § 1500 (West Supp.1993). The court first examines the exhaustion requirement before turning to the issue of exclusivity of jurisdiction in the Court of Federal Claims.

**1. *Exhaustion of Administrative Remedies***

▉ The CDA provides, in pertinent part, that

> this chapter applies to any express or implied contract ... entered into by an executive agency for—
>
> (1) the procurement of property, other than real property in being;
>
> (2) the procurement of services;
>
> (3) the procurement of construction, alteration, repair or maintenance of real property; or
>
> (4) the disposal of personal property.

41 U.S.C.A. § 602(a) (West 1987). Thus, by its express terms, the CDA applies to the contract between the EPA and WRS because it is a contract for clean-up services. The purpose of enacting the CDA was to create a comprehensive statutory scheme of administrative and legal remedies so that contract claims against the Government could be uniformly resolved. *See Coffey v. United States,* 626 F.Supp. 1246, 1249 (D.Kan.1986).

▉ The CDA provides an express procedure for administrative resolution of claims. Subsection 605(a) provides that "[a]ll claims ... against the government ... shall

be in writing and shall be submitted to the contracting officer for a decision," and § 606 provides that a contractor may appeal the decision of the contracting officer "to an agency board of contract appeals." Section 609 provides that "in lieu of appealing the decision of the contracting officer ... to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims...." An aggrieved contractor must first submit his claim to the contracting officer and receive a decision before a suit can be commenced in the Court of Federal Claims because, as the Court of Federal Claims noted,[11] "completion of these steps is a jurisdictional prerequisite to the filing of a complaint relative to the claim in this court." *Christian Appalachian Project, Inc. v. United States,* 10 Cl.Ct. 595, 587 (1986). *See also Thoen v. United States,* 765 F.2d 1110, 1116 (Fed.Cir.1985) (holding, with respect to a certified claim, that "Congress has determined that submission of a ... claim to the contracting officer in the first instance is a jurisdictional prerequisite to filing a suit in the Claims Court"). Accordingly, the Court of Federal Claims lacks jurisdiction to entertain a contract dispute against the United States unless the administrative procedures articulated in the CDA have first been satisfied. This is in keeping with the general federal policy of requiring exhaustion of administrative remedies before seeking review by a court of competent jurisdiction. *See, e.g., McCarthy v. Madigan,* —— U.S. ——, ——, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291, 299 (1993) ("This Court has long acknowledged the general rule that parties exhaust prescribed administrative remedies before seeking relief from the federal courts. Exhaustion is required because it serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency."). The record does not reveal that a contracting officer has ever issued a decision with respect to WRS's

---

**10.** 28 U.S.C.A. §§ 1346(a)(2), 1491(a)(1) are popularly known as the Tucker Act. Subsection 1346(a)(2) is often referred to as the "little Tucker Act." *See Western Secs. Co. v. Derwinski,* 937 F.2d 1276, 1279 (7th Cir.1991).

**11.** The Court of Claims was the predecessor court of the Court of Federal Claims, which assumed its new name pursuant to the Court of Federal Claims Technical and Procedural Improvements Act of 1992, *see* 28 U.S.C.A. §§ 171–180 (West 1993).

claim.[12] Thus, WRS has failed to comply with the CDA because it did not first exhaust its administrative remedies.

### 2. Exclusive Jurisdiction in the Court of Federal Claims

The EPA contends that even if WRS has complied with the exhaustion requirements of the CDA, this court lacks subject matter jurisdiction to hear this action because 28 U.S.C.A. § 1346(a)(2) vests exclusive jurisdiction in the Court of Federal Claims. WRS asserts, however, that jurisdiction is proper in this court either by virtue of 28 U.S.C.A. §§ 1367 or 1500. These contentions are addressed in turn.

Section 1346 provides in pertinent part:

(a) The district courts shall have original jurisdiction, concurrent with the United States Court of Federal Claims, of:

. . . .

(2) Any other civil action or claim against the United States ... *except that the district courts shall not have jurisdiction of any civil action or claim against the United States founded upon any express or implied contract with the United States* or for liquidated or unliquidated damages in cases not sounding in tort which are subject to section 8(g)(1) and 10(1)(1) of the Contract Disputes Act of 1978.

28 U.S.C.A. § 1346(a)(2) (West 1993) (emphasis added). The statute clearly provides that the Court of Federal Claims has exclusive jurisdiction with respect to contract actions properly brought under the CDA against the United States. Indeed, the CDA specifically amended § 1346(a)(2) in 1978 to deprive the district courts of jurisdiction over civil actions against the United States predicated upon a contract claim falling within the purview of the CDA:

Section 10(a) [of the CDA] is amended by allowing contractors with suits against the Government ... to bring direct action *only in the Court of Claims. U[nited] S[tates] district court jurisdiction is elim-inated from Government contract claims.* The committees believe that only one court jurisdiction is needed to handle direct actions and that court should be the Court of Claims which historically has been the court of greatest expertise in Government contract claims.... This obviates the need for localized district courts to hear cases.

S.Rep. No. 95–1118, 95th Cong., 2d Sess. 10, *reprinted in* 1978 U.S.C.C.A.N. 5235, 5244 (emphasis added). The courts therefore uniformly hold that § 1346(a)(2) deprives the district courts of jurisdiction to entertain contract disputes subject to the CDA. *See, e.g., Ingersoll–Rand Co. v. United States,* 780 F.2d 74, 76 (D.C.Cir.1985) ("[T]he CDA limits adjudication of [this contract claim] to the Claims Court"); *County Waste, Inc. v. United States,* 752 F.Supp. 449, 450–451 (S.D.Fla. 1990) ("[T]he purpose of the CDA and its legislative history leave no question that in amending [§] 1346(a)(2) Congress intended to deprive the district courts of jurisdiction over contract claims against the United States which are subject to the Contract Disputes Act."); *Management Science America, Inc. v. Pierce,* 598 F.Supp. 223, 225 (N.D.Ga.1984) ("The CDA ... specifically abolishes the jurisdiction of federal district courts to hear claims ... which [are] subject to the CDA."), *aff'd without opinion,* 778 F.2d 792 (11th Cir.1985). As a corollary, the courts also uniformly hold that § 1346(a)(2) vests jurisdiction exclusively in the Court of Federal Claims. *See, e.g., Weeks Constr, Inc. v. Oglala Sioux Housing Auth.,* 797 F.2d 668, 674–75 (8th Cir.1986) ("[U]nder the Tucker Act, 28 U.S.C. §§ 1346(a) and 1491(a)(1), the exclusive forum for this section is the Claims Court...."); *Portsmouth Redevelopment & Housing Auth. v. Pierce,* 706 F.2d 471, 473 (4th Cir.) ("The Tucker Act ... vest[s] subject matter jurisdiction exclusively in the Claims Court."), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). This court therefore concludes that it lacks jurisdiction to entertain WRS's con-

---

**12.** At the hearing on these motions, WRS represented to the court that it subsequently presented its claim to a hearing officer, who concluded that the claim was not yet ripe. This docs not alter the result of this opinion, but rather further demonstrates that WRS has not exhausted its administrative remedies.

tract claim, but will nevertheless address its contentions.

#### a. *Jurisdiction under 28 U.S.C.A. § 1367*

▮ WRS's first contention is that jurisdiction is proper in this court under the supplemental jurisdiction provision, which provides in pertinent part:

> (a) *Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute,* in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

28 U.S.C.A. § 1367(a) (West 1993) (emphasis added). Section 1367 therefore is merely a codified modification of the doctrines of pendant and ancillary jurisdiction. *See id.* (practice commentary). Thus, it confers jurisdiction in the district court over common law claims, which would ordinarily be brought in state court, but that are appended to federal claims and thus properly in federal court by virtue of *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). In *Gibbs,* the Court concluded that the district court could entertain state law claims added to federal claims provided that the state law claims arose from "a common nucleus of operative fact" as the federal claims. *Id.* at 725, 86 S.Ct. at 1138. This eased the strictures of *Hurn v. Oursler,* 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), which essentially required plaintiffs to bring two suits, in the separate courts, on the state and federal claims unless the claims shared all of the same factual elements.

▮ This section therefore confers federal jurisdiction over state claims, not federal claims. Additionally, by its express provisions, this section only confers jurisdiction in the district court unless it or another federal statute provides otherwise. Here, § 1346(a)(2) is just such a federal statute because it provides that jurisdiction over WRS's crossclaim rests exclusively with the Court of Federal Claims. As one court re-

cently observed with respect to a plaintiff's contention that § 1367 conferred jurisdiction in the district court over a contract claim against the United States:

> No jurisdiction exists under 28 U.S.C. § 1367, the supplemental jurisdiction statute.... Section 1367 allows the district courts to hear related state claims, otherwise properly asserted in *state* court, *not* the *Claims Court.* No authority is cited for the proposition that Congress intended § 1367 to supplant the jurisdiction of the Claims Court for money damage claims against the United States.

*Sumner Peck Ranch, Inc. v. Bureau of Reclamation,* 823 F.Supp. 715, 748 (E.D.Cal. 1993). Accordingly, § 1367 does not confer jurisdiction on this court to adjudicate this claim.

#### b. *Jurisdiction under 28 U.S.C.A. § 1500*

▮ WRS's second contention is that 28 U.S.C.A. § 1500 vests this court with subject matter jurisdiction. That statute provides:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

28 U.S.C.A. § 1500 (West Supp.1993). WRS misperceives both the purpose and the substance of this statute. As both the Federal Circuit and the Supreme Court have observed, *see UNR, Industries, Inc. v. United States,* 962 F.2d 1013, 1021 (Fed.Cir.1992) (en banc), *aff'd sub nom. Keene Corp. v. United States,* —— U.S. ——, ——, 113 S.Ct. 2035, 2040, 124 L.Ed.2d 118, 127 (1993), the purpose of § 1500 is to coerce selection of a forum so that the United States is not compelled to defend simultaneous actions in different courts. With respect to substance, § 1500 does not create or confer jurisdiction in the district court; rather, it merely provides that if the same claim is properly pend-

ing in another court at the same time that suit is filed in the Court of Federal Claims, the Court of Federal Claims has no jurisdiction to hear the action. *UNR Indus., Inc.*, 962 F.2d at 1021. The Court of Federal Claims is thus divested of jurisdiction provided that the suit is otherwise proper in the district court. *See Sanborn v. United States*, 453 F.Supp. 651, 654–55 (E.D.Cal.1977). This court, therefore, must determine first whether this breach of contract claim is proper here.

 Section 1500 does not vitiate the provisions of § 1346(a)(2), which exclusively establishes jurisdiction in the Court of Federal Claims for breach of contract claims against the United States exceeding $10,-000.00. Various courts have held that if a breach of contract claim against the United States exceeds $10,000.00, then the district courts have no jurisdiction to entertain the claim because the Court of Federal Claims has exclusive jurisdiction over such claims. *See, e.g., Western Secs. Co. v. Derwinski*, 937 F.2d 1276, 1279 (7th Cir.1991); *Siamonok v. Siamonok*, 918 F.2d 947, 950–51 (Fed.Cir. 1990). Here, WRS's crossclaim exceeds $10,-000.00. Thus, this court lacks jurisdiction to hear it, despite § 1500. As the *Sanborn* court observed in rejecting the contention that § 1500 conferred jurisdiction in the district court with respect to a claim in excess of $10,000.00:

[Subsection] 1346(a)(2) ... limits the district court's jurisdiction to claims involving $10,000 in damages or less. Nowhere in 28 U.S.C. § 1500 does it say that, where the Court of Claims loses its jurisdiction, said jurisdiction becomes vested in the district court. Absent such a provision, this court cannot find that Section 1500 operates to vest this court with jurisdiction over ... claims which seek over $10,000 in damages.

*See Sanborn*, 453 F.Supp. at 654–55. This court concludes that § 1500 does not confer jurisdiction on this court to entertain this claim.

13. *See supra* n. 2.

### E. *WRS's motion for summary judgment*

RLAD asserted the same claims against WRS that it asserted against the EPA.[13] Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, WRS has moved for summary judgment with respect to these claims, contending that there is no genuine issue as to material fact and that it is entitled to judgment as a matter of law. Specifically, WRS raises the government contractor defense as articulated in *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), and *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The essence of WRS's contention is that it is relieved of liability to RLAD because WRS merely executed the instructions of the EPA in cleaning up the site. Conversely, RLAD claims that the defense is inapplicable to this action.

#### 1. *Yearsley*

In *Yearsley*, the defendant contractor injured the real property of riparian landowners while constructing dikes in the Missouri River pursuant to a contract with the United States. *Yearsley*, 309 U.S. at 19, 60 S.Ct. at 414. This construction project was statutorily authorized by Congress and supervised by federal officials. *Id.* The landowners sued the contractor for damages pursuant to state law, alleging that the contractor had caused the erosion of their realty. *Id.* The Supreme Court, however, rejected the landowners' suit, holding that the contractor could not be held liable for the injuries. The Court concluded that because the "authority to carry out the project was validly conferred, that is, [it] was done ... within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Id.* at 20–21, 60 S.Ct. at 414. The Court reasoned that the contractor could not be held liable because it was a government agent "simply acting under the authority thus validly conferred." *Id.* at 22, 60 S.Ct. at 415. Therefore, because "[t]he action of the agent is 'the act of the government,'" and the government had the authority to execute the project, the contractor could not be held liable. *Id.*

## 2. *Boyle*

In *Boyle*, the Court elaborated on the defense articulated in *Yearsley*. In *Boyle*, the defendant-manufacturer, pursuant to specifications provided by the United States, constructed a military helicopter with an allegedly defective escape hatch. *Id.* 487 U.S. at 502–03, 108 S.Ct. at 2513. As a result of this alleged defect, the copilot of the helicopter was drowned when his craft crashed into the water because he could not extricate himself from the wreckage. *Id.* at 502, 108 S.Ct. at 2513. The executor of the copilot's estate sued the manufacturer, contending that he could assert state tort claims against the manufacturer. *Id.* at 503, 108 S.Ct. at 2513. A jury returned a verdict in favor of the executor, and the district court denied the manufacturer's motion for judgment notwithstanding the verdict. *Id.* The Supreme Court, however, ruled that the government contractor defense generally immunized government contractors from tort liability for flaws in product design dictated by procurement contracts and thus held that the manufacturer was not liable. *Id.* at 505–06, 108 S.Ct. at 2515. The Court concluded that state tort law will be preempted by federal common law if the subject matter of the suit involves "uniquely federal interests," *id.* at 504, 108 S.Ct. at 2514, and a "significant conflict" exists between a federal policy and state law, *id.* at 511, 108 S.Ct. at 2518. The Court concluded that the contours of this defense were shaped by the discretionary function exception to the FTCA.

The Court initially observed that the policy decisions encompassing these uniquely federal interests "are so committed by the Constitution and laws of the United States" that state law would be displaced by federal common law. *Id.* at 504, 108 S.Ct. at 2514. The Court then stated that two of these uniquely federal interests were the obligations, rights, and remedies of the United States under its contracts, which are "governed exclusively by federal law," *id.*, and "the civil liability of federal officials for actions taken in the course of their duty," *id.* at 505, 108 S.Ct. at 2515. Given these two uniquely federal interests, the Court had to fashion a method to harmonize them with state tort law. The

medium that the Court concluded was best suited to achieve this harmony was the discretionary function exception to the FTCA. Thus, the Court employed the discretionary function exception to the FTCA to define the parameters of the defense. From the clash of two competing principles—state tort law and the United States's sovereign immunity—the defense emerged.

 The discretionary function exception to the FTCA relieves the United States from liability for its agents' performance of duties involving discretionary decisions. *Id.* at 510–12, 108 S.Ct. at 2517–18. The defense therefore stems from the doctrine of sovereign immunity, as specifically enjoyed by the United States under the FTCA. As *Boyle* observed, however, the FTCA permits actions for damages against the United States for injuries caused by the tortious conduct of government agents or employees acting within the scope of their employment to the extent that a private person would be liable under state law. *See* 28 U.S.C.A. § 1346(b) (West 1993). This waiver of sovereign immunity, however, is inapplicable to claims based upon discretionary functions of government agents or employees. *See id.* at § 2680(a). The discretionary function exception provides that government agents and employees will not be held liable if performance of their duties necessarily involves making decisions based on judgments that are grounded in public policy. *See Berkovitz v. United States*, 486 U.S. 531, 536–37, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988). Even "assuming that the challenged conduct involves an element of judgment, a court must still determine whether that judgment is of a kind that the discretionary function exception was designed to shield." *Id.* at 536, 108 S.Ct. at 1959. Accordingly, the exception "protect[s] only governmental actions and decisions based on considerations of public policy." *Id.* The purpose of the exception is to " 'prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.' " *Id.* (quoting *United States v. Varig Airlines*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984)). The exception does not apply if a "federal statute, regulation, or policy specifi-

cally prescribes a course of action for an employee to follow." *Id.* 486 U.S. at 536, 108 S.Ct. at 1958. To trigger operation of the exception, a defendant must demonstrate that the governmental authority approved of the challenged conduct and that this approval encompassed the permissible exercise of judgment.

The *Boyle* Court concluded that this discretionary function exception to the FTCA determines the parameters of the "significant conflict" between federal interests and the operation of state law. The Court articulated a rationale for this defense: stability of the United States to enter into contracts free from the imposition of liability by operation of state tort law and the cost of judgments rendered against government contractors, which would ultimately be absorbed by the United States:

> [W]e are ... of the view that permitting "second-guessing" of these [federal policy decisions] through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burden of judgments against the contractors would ultimately be passed through ... to the United States itself, since ... contractors will predictably raise their prices to cover ... contingent liability for the Government-ordered designs.

*Id.* at 511–12, 108 S.Ct. at 2518. Thus, the rationale for the defense serves the purpose of the discretionary functions exception to the FTCA and is merely an extension of that exception, because, as the Court noted, to insulate the United States from its discretionary decisions, but not to do likewise when the United States enters into contracts with others to execute the will of the United States "makes little sense," *id.* This rationale becomes readily salient if state tort law were not preempted by the overriding federal interest in government contracts: "[t]he imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected." *Id.* at 507,

108 S.Ct. at 2515–16. The United States would not be able to procure the goods it needs, or it would have to purchase them at extraordinarily inflated prices. Without the defense, the operations of the United States would be substantially impeded and the its own immunity would be greatly undermined.

Having first concluded that the challenged action was a discretionary function, the precipitate of the Court's concerns over balancing state tort law with preserving sovereign immunity under the discretionary function exception to the FTCA was a three-prong test for determining whether state tort law was preempted by federal common law in suits against government contractors:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

*Id.* at 512, 108 S.Ct. at 2518. If the government contractor satisfies all three prongs, he is immune from liability under state tort law.

### 3. *Applicability of Boyle*

Before considering the application of the three-prong test of *Boyle*, the court must first determine whether *Boyle* applies to this action. *Boyle* was decided in the context of a military procurement contract for the manufacture of specific equipment. In the instant action, the contract is one of performance, not procurement, and is one in which the EPA, not the military, is involved.

The court notes that there is a split of authority with respect to whether *Boyle* is confined to military procurement contracts or whether *Boyle* enjoys broader application. For example, the Third Circuit Court of Appeals has concluded that *Boyle* applies to both military and nonmilitary procurement contracts. *See Carley v. Wheeled Coach*, 991 F.2d 1117, 1119 (3d Cir.1993). Conversely, the Ninth Circuit Court of Appeals has concluded that *Boyle* is restricted to the military procurement contracts. *See In re Hawaii Federal Asbestos Cases*, 960 F.2d 806, 810–12

(9th Cir.1992). The Fourth Circuit Court of Appeals has not addressed this issue, so this court must determine first whether *Boyle* applies to nonmilitary contracts and second if it also applies to performance contracts.[14]

### a. *Applicability of Boyle Outside the Military Context*

The first issue to be resolved is whether the government contractor defense as articulated in *Boyle* applies to nonmilitary contracts. Material to the *Boyle* Court's resolution of the case was a determination that uniquely federal interests are governed by federal law. In *Boyle*, the two such interests were the contractual obligations of the United States and the civil liability of its agents and employees in the scope of their official duty. *Boyle*, 487 U.S. at 504–05, 108 S.Ct. at 2514. While these two interests served as the predicate for the defense in *Boyle*, neither of these interests is confined solely to military contracts. Rather, the ability of the United States to contract and to supervise the actions of its agents and employees can apply equally to other contracts and is an integral function for government administration.

The *Boyle* Court recognized the general applicability of this proposition by its extrapolation from *Yearsley*. *Boyle* reiterated *Yearsley*'s reasoning that if the authority were validly bestowed on the contractor and the contractor did not exceed the scope of the authority so conferred, the contractor cannot be held liable for executing the will of the sovereign. The United States is extending its sovereign immunity to the contractor, and there is simply no reason why a nonmilitary contractor should be barred from enjoying this extension of immunity simply because he does not contract with the armed forces.

Another reason for concluding that *Boyle* extends to all contractors was the

---

**14.** As an initial matter, this court observes that some courts have dubbed this "government contractor defense" with various appellations and have held that *Yearsley* and *Boyle* present separate and discrete defenses. For instance, in *Shaw v. Grumman Aerospace Corp.*, 778 F.2d 736 (11th Cir.1985) (criticized in *Boyle*, 487 U.S. at 513, 108 S.Ct. at 2519) (questioned by *Harduvel v. General Dynamics Corp.*, 878 F.2d 1311, 1316 (11th Cir.1989), *cert. denied*, 494 U.S. 1030, 110 S.Ct. 1479, 108 L.Ed.2d 615 (1990)), *cert. denied*, 487 U.S. 1233, 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988), although a pre-*Boyle* case, the court held that the generic term "government contractor defense" was more properly understood to comprise three distinct defenses: the "military contractor defense," the "contract specifications defense," and the "government agency defense." *Id.* at 739–41. The *Shaw* court stated that the term "military contractor defense," was "more descriptive and more precise" than the "more common 'government contractor defense.'" *Id.* at 739 n. 3. The court noted that the military contractor defense was "neither the same as, nor d[id] it grow out of, either of the other two theories." *Id.* at 740. The court stated that this defense had its genesis in the separation of powers doctrine and its rationale was based on effective preparation for war. *Id.* Next, the court stated that the "contract specifications defense" applied to a contractor manufacturing products and was "unlikely to be available" with respect to "suits involving military suppliers who participate in ... product design." *Id.* at 739. Finally, the court observed that the "government agency defense" sprang from *Yearsley*, *id.*, was based on a contractor "shar[ing] in federal sovereign immunity," *id.*, was "rarely invoked," *id.* at 740,

and involved a three-prong test to evaluate such a claim in the military contractor context, *id.* In a post-*Boyle* case, the court in *Amtreco, Inc. v. O.H. Materials, Inc.*, 802 F.Supp. 443, 445–46 (M.D.Ga.1992), retained substantive and nomenclatural differences articulated in *Shaw*.

Conversely, the Third Circuit Court of Appeals has stated that the term "government contractor defense," while usually employed in connection with government contracts with military contractors, generally encompasses the defense of a contractor with respect to his government contracts. *See Beaver Valley Power Co. v. National Eng'g & Contracting Co.*, 883 F.2d 1210, 1215 n. 4 (3d Cir.1989) (citations omitted). The *Beaver Valley* court stated that shielding contractors from liability is derived generally from *Yearsley* and is the basis for the defense. *Id.* The court further stated that while some courts "viewed the government contractor defense as doctrinally discrete from *Yearsley* and similar 'government agency defense' cases," the defenses were essentially the same because the "government agency defense" was merely the "progenitor of a 'government contractor defense' in the federal military context." *Id.* (citation omitted).

The *Beaver Valley* court referred to the defense as the "government contractor defense," apparently employing a general term for what it concluded to be a general defense available to government contractors. Likewise, this court concludes that the defense is best dubbed the "government contractor defense." This term more accurately describes the defense because it connotes that an entity entering into a contract with the United States may assert the defense and does not invite confusion via nomenclature.

*Boyle* Court's explicit rejection of the *Feres–Stencel* doctrine and its reliance on the discretionary function exception to the FTCA to support its holding. The *Feres–Stencel* doctrine immunizes the United States from tort liability for injuries to servicemen arising from their military service, *see Feres v. United States,* 340 U.S. 135, 146, 71 S.Ct. 153, 159, 95 L.Ed. 152 (1950), and from indemnification to a third party for damages paid by it to a member of the armed forces injured in the course of military service, *see Stencel Aero Eng'g Corp. v. United States,* 431 U.S. 666, 673–74, 97 S.Ct. 2054, 2059, 52 L.Ed.2d 665 (1977). Prior to *Boyle,* the courts concluded that the *Feres–Stencel* doctrine was the genesis of the government contractor defense. *See, e.g., McKay v. Rockwell Int'l Corp.,* 704 F.2d 444, 449 (9th Cir.1983), *cert. denied,* 464 U.S. 1043, 104 S.Ct. 711, 79 L.Ed.2d 175 (1984). Indeed, the Fourth Circuit *Boyle* opinion, *see* 792 F.2d 413, 414 (4th Cir.1986) (per curiam), resolved the issue based on *Tozer v. LTV Corp.,* 792 F.2d 403, 408 (4th Cir.1986), *cert. denied,* 487 U.S. 1233, 108 S.Ct. 2897, 101 L.Ed.2d 931 (1988), a companion case to *Boyle* and simultaneously delivered with *Boyle,* and *Tozer* expressly referenced *McKay*'s application of the *Feres–Stencel* doctrine to determine the contours of the government contractor defense. The Supreme Court, however, concluded that the doctrine was not the proper basis for the government contractor defense because it was both too broad and too narrow an avenue for the imposition of liability. *Boyle,* 487 U.S. at 510–11, 108 S.Ct. at 2518. Rather, as stated, *Boyle* defined the defense based on the discretionary function exception to the FTCA. Unlike the *Feres–Stencel* immunity doctrine, which is restricted to military application, the FTCA applies generally to persons seeking to sue the United States. The *Boyle* Court's rejection of the military-based doctrine as a basis for the government contractor defense in favor of the more-encompassing FTCA compels this court to conclude that the defense applies to all contractors, not exclusively military contractors. This conclusion is consonant with the Third, Seventh, and Eleventh Courts of Appeals. *See Carley,* 991 F.2d at 1119; *Boruski v. United States,* 803 F.2d 1421, 1430 (7th Cir.1986)

(pre-*Boyle* case); *Burgess v. Colorado Serum Co.,* 772 F.2d 844, 846 (11th Cir.1985) (same). This court believes that the Fourth Circuit Court of Appeals would follow this majority rule, rather than the rule restricting *Boyle* to military contractors, as espoused by the Ninth Circuit in *In re Hawaii Federal Asbestos Cases,* 960 F.2d at 810–12.

### b. *Applicability of Boyle to Performance Contracts*

■ The court must now determine whether *Boyle,* which addressed a procurement contract, also applies to performance contracts. As stated, *Boyle* repeated *Yearsley's* conclusion that a contractor cannot be held liable for executing the United States's directives provided the United States could validly confer the authority and this authority was not exceeded by the contractor. In *Yearsley* the contractor was an agent of the United States, while in *Boyle,* the contractor was an independent contractor. *Boyle,* 487 U.S. at 505–06, 108 S.Ct. at 2515. The Court stated that this was a distinction without a difference because the federal interest in performance of a contract, as in *Yearsley,* was as equally compelling as the federal interest in the procurement of a contract, as in *Boyle. Id.* at 506, 108 S.Ct. at 2515. The dispositive issue is not one of performance versus procurement, but whether there is a uniquely federal interest in the subject matter of the contract. Performance therefore is on an equal footing with procurement, provided that there exists the uniquely federal interest: "[t]he federal interest justifying this holding surely exists as much in procurement contracts as in performance contracts; we see no basis for a distinction.... Either way the interests of the United States will be directly affected." *Id.* at 506–07, 108 S.Ct. at 2516. Other courts have similarly applied *Boyle* to performance contracts. *See Lamb v. Martin Marietta Energy Sys., Inc.,* 835 F.Supp. 959, 966 & n. 7 (W.D.Ky.1993); *Crawford v. National Lead Co.,* 784 F.Supp. 439, 445–46 n. 7 (S.D. Ohio. 1989); *see also Carley,* 991 F.2d at 1120 (Although a procurement contract, the court noted that there was no material distinction between contracts for performance and those of procurement as

far as the principles of *Boyle* applied.). This court therefore holds that *Boyle* applies to performance contracts.

### c. *Boyle Applied*

Concluding that *Boyle* applies to this action, however, does not end the inquiry. The court must first determine whether placement of the stockpile constituted a discretionary function. If so, then the three-prong test is applied.

 Under the discretionary function exception, the EPA will not be liable if the challenged government action involved an element of judgment or choice and if the challenged government action is based on considerations of public policy. *Berkovitz*, 486 U.S. at 535–37, 108 S.Ct. at 1958–59. Here, the record conclusively establishes that the exception has been satisfied. First, CERCLA grants the EPA discretion with respect to clean-up of contaminated sites. *See generally* 42 U.S.C.A. § 9621 (West Supp.1993); *see also United States v. Skipper*, 781 F.Supp. 1106, 1113–14 (E.D.N.C.1991). There is therefore no "federal statute, regulation, or policy specifically prescribing a course of action" for the EPA is follow. *Berkovitz*, 486 U.S. at 537, 108 S.Ct. at 1959. In this action, the EPA exercised its discretion in determining the best method to effectuate clean-up. Because the EPA's decisions in effectuating clean-up are discretionary, the first prong of the discretionary function test is satisfied. Second, the record indisputably reveals that the EPA's stockpiling of contaminated dirt involved considerations based on public policy; indeed, the record is uncontradicted on this issue. The factors influencing the EPA's decision with regard to stockpiling included: (1) the existence of prior contamination at the site, i.e., if the stockpile were placed on already-contaminated land, then there would be less net contamination; (2) the lack of accessibility to schools and residences; (3) the distance from operations at Carolina; (4) the accessibility of vehicles involved in transportation and disposal; (5) the distance from streams and waterways; and (6) the need to control migration of the dirt after stockpiling. *See* Affidavit of Mike Norman at ¶¶ 19, 20; Supplemental Affidavit of Mike Norman at ¶ 8; Affidavit of James Webster at ¶¶ 16, 17. The courts have consistently held that the EPA's decisions with respect to clean-up of contaminated sites fall within the ambit of the discretionary function exception. *See, e.g., United States Fidelity & Guar. Co.*, 837 F.2d 116, 122–23 (3d Cir.), *cert. denied*, 487 U.S. 1235, 108 S.Ct. 2902, 101 L.Ed.2d 935 (1988); *United States v. Amtreco, Inc.*, 790 F.Supp. 1576, 1581 (M.D.Ga.1992); *United States v. Skipper*, 781 F.Supp. at 1113–14. All of these factors involve considerations of public policy, and there is no evidence to the contrary. This court has no difficulty in concluding that the second prong of the discretionary function exception was met.

Having concluded that the decisions concerning the stockpiling satisfied the discretionary function exception, the court must now apply the three-prong test of *Boyle* to determine whether state law must be displaced. Accordingly, the court must determine whether state tort law will be preempted by federal common law, which determines whether WRS may raise the government contractor defense.

 First, the EPA approved the site for clean-up activity. The EPA determined the best method to execute this activity and further determined the mode in which clean-up was to be effectuated. As a consequence, the EPA hired WRS to excavate and remove contaminated soil from the site and arrange for its disposal. The parties agree that the EPA made the decisions with respect to cleaning up the site, determining the location of the stockpile, and maintaining the stockpile; moreover, the EPA's directions were precise regarding these decisions. Thus, WRS was a vehicle for executing the EPA's clean-up activities. These facts are not disputed. The first prong of *Boyle* is met.

 Second, the record reveals that WRS performed the clean-up according to the specifications issued by the EPA. Indeed, the evidence produced by WRS showed that it conformed to the EPA's directives with respect to the stockpiling of the contaminated dirt. Under *Celotex Corp.* therefore, the burden shifts to RLAD to come forward with evidence demonstrating that WRS failed

to comply with these specifications. RLAD, however, has failed to meet its procedural burden because it has proffered no evidence to the contrary. Rather, RLAD now attempts to inject rank speculation into these proceedings by asserting that WRS may "possibly" have been negligent in its placement of the stockpile or "possibly" negligent in its placement of a tarpaulin covering the stockpile. This idle speculation, which has no basis in the record, is clearly insufficient to overcome the procedural standards demanded by *Celotex Corp.* As the Fourth Circuit Court of Appeals has observed, RLAD "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *See Beale,* 769 F.2d at 241. Here, WRS merely implemented the remedy that the EPA had previously determined was appropriate. The second prong of *Boyle* is met.

Third, there is no evidence that WRS was aware of any dangers with respect to the clean-up activity of which the EPA was not also cognizant. Indeed, because the EPA determined that the site required clean-up and further determined the manner to effectuate clean-up, the logical conclusion is that the EPA was fully apprised of any danger. RLAD has elicited no evidence tending to demonstrate that WRS was aware of any dangers known to it but concealed from the EPA. The third prong of *Boyle* is therefore satisfied. Because the EPA's action with respect to effectuating clean-up of the site is a discretionary function and because WRS satisfied the three-prong test of *Boyle* to determine whether state tort law would be displaced, the court concludes that WRS's motion for summary judgment should be granted.

## V. *CONCLUSION*

**THEREFORE, IT IS ORDERED** that RLAD's claims brought against the EPA pursuant to the FTCA are dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and that the EPA is entitled to summary judgment with respect to RLAD's CERCLA claim pursuant to Rule 56(c) of the Federal Rules of Civil Procedure;

**IT IS FURTHER ORDERED** that the EPA is entitled to summary judgment with respect to the indemnification crossclaims of WRS and Carolina pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and that WRS's breach of contract crossclaim against the EPA is dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure; and

**IT IS FURTHER ORDERED** that WRS is entitled to summary judgment against RLAD pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED.**